**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| SAMUEL J. CRUMP, | : | CIVIL ACTION NO. |
| BOP Reg. # 63258-019, | : | 2:16-CV-00240-RWS-JCF |
|     Movant, | : | |
| | : | CRIMINAL ACTION NO. |
|     v. | : | 2:11-CR-44-RWS-JCF-3 |
| | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | MOTION TO VACATE |
|     Respondent. | : | 28 U.S.C. § 2255 |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Movant has filed a 28 U.S.C. § 2255 motion to vacate his sentence. (Doc. 307).

**IT IS RECOMMENDED** that the motion be **DENIED**.

## I.    Background

On December 10, 2013, a federal grand jury returned a three-count superseding indictment against Crump [Movant] and his co-defendant Ray Adams. The indictment charged Crump with conspiring [in 2011] to possess and produce the biological toxin ricin for use as a weapon in Count One and with possessing the biological toxin ricin in its naturally occurring form, castor beans, for use as a weapon in Count Two, both in violation of Title 18, United States Code, Section 175(a). Crump was convicted of Counts One and Two.

(Doc. 317 (Gov't Resp.) at 10 (citations omitted)). On November 14, 2014, Movant

received two concurrent 120-month sentences. (Doc. 250). He appealed, raising a

single issue: "whether his conviction is invalid because § 175(a) failed to provide him

with fair notice that the conduct in which he engaged was prohibited." (Doc. 283 at 2). On July 6, 2015, the Eleventh Circuit held that Movant's "conduct clearly transgressed 18 U.S.C. § 175(a). Thus, his complaint of vagueness is unavailing . . . ." (*Id.* at 4).

The government provides the following factual background:

In July 2010, Joseph Sims, Jr., an inmate in the Anderson County South Carolina Jail, contacted the Federal Bureau of Investigation ("FBI") and reported that he had information that members of the Militia of Georgia ("MOG") were engaged in illegal activity, including training with unregistered fully automatic weapons and destructive devices. (Doc. 271 [at] 117, 232-73). In 2011, the FBI signed Sims up as an informant and he consensually digitally recorded telephone calls and meetings he had with individuals associated with the MOG, including Crump. ([*Id.* at] 131-32).

On September 17, 2011, Sims consensually recorded a meeting with Crump, Ray Adams, Emory Dan Roberts, and others at Adams's residence in Toccoa, Georgia. (Gov't Ex. 5-T). Sims asked Crump, "The stuff that, um, Dan [Roberts] said you can make, you still make that?" (*Id.* at 17). Crump replied, "Yea." (*Id.*).

The following conversation then occurred:

> Crump: What I'd like to do is make, uh, about 10 pounds of that. Give you 2, me 2, Ray [Adams] 2, Dan [Roberts] 2, and somebody else 2. Put it out in different cities at the same time: Washington, DC; maybe Newark, NJ; Atlanta, GA; Jacksonville, FL; New Orleans. Dump that little (unintelligible) that's all ya gotta do is lay it in the damn road, the cars are gonna spread it.

2

> Sims: Yea, but what's it take to make it? I haven't got a clue.

> Crump: Just some seed. I got the, uh, got one more ingredient, and I'll get it today. (Unintelligible) you be here when we make it. Ray's (Adams) gonna make it.

(*Id.* at 17-19).

(Gov't Resp. at 3-4 (footnote omitted)).

Crump then suggested dispersing ricin in the Atlanta area, telling Sims the following: "Ya get on the perimeter of Atlanta, you get up on the north side, ya get on 41, ya throw it out there right on 285, ya go up 41 or 75, go up 75 to get away from it. Keep the heater on, that way it keeps the pressure out. Don't roll your window down." ([Gov't Ex. 5-T] at 23-24).

Crump eventually called Adams over and the following conversation occurred:

> Crump: What's the name of that worst poison, Ray?
> Adams: Ricin.
> Crump: No, the other one.
> Adams: What other one?
> Crump: Kills about 30 million people at one time, about a pound of it. It's caused from dead food . . . rotten food.
> Adams: Oh, botulism.

(*Id.* at 24-25).

On October 6, 2011, Sims consensually recorded a meeting with Crump and asked about his plans to make ricin. (Gov't Ex. 6-T). Crump told Sims, "I'll bring ya some seed," (referring to castor beans) and then explained that the items needed to make ricin included castor beans,

acetone, lye, and a mixer. (*Id.* at 2). Crump also explained that when searching for or purchasing materials to make ricin, a person should buy the materials at different locations and away from where the person lives. (*Id.* at 2-3). Crump also warned against searching or purchasing ingredients on the Internet because it could be tracked. (*Id.* at 24-25). Crump made the following additional comments regarding making ricin:

> • "When ya soak it [castor bean], that lye takes the hull off the seeds. Then ya take the seeds up (unintelligible). Then one ounce of seed to two maybe three ounces of acetone. All that acetone is [] your drying compound. Once you put [it] in a blender, keep blendin' it up, it's gonna come out like baby powder. But now ya gotta be careful of that shit";

> • "It's [ricin] gotta be put in a jar after it comes out of the blender. Ya can't handle that shit with your bare hands. Ya got to have gloves";

> • "There's no cure for it [ricin] once it gets into your lungs. You're gone. You can kiss it goodbye";

> • "If it [ricin] gets on your skin, it soaks into your skin, you're gone. This damn stuff is dangerous";

> • "I can get ya seed [castor beans]. I know where the seeds is at right now";

(*Id.* at 2-11, 16-17).

(Gov't Resp. at 5-6; *see id.* at 6-7 (listing more of Movant's "comments regarding dispersing ricin")).

On October 15, 2011, Sims recorded a conversation in which Movant discussed

4

the equipment needed to make ricin from castor beans and during which Adams

retrieved a castor bean from storage and gave it to Movant, who gave it to Sims; and

on October 26, 2011, Sims recorded a conversation in which Movant "talked about

building and testing a delivery system to disperse ricin[ and] mentioned that he was

having trouble finding the Red Devil lye and told Sims to get as much lye [as] he

could find after Sims offered to find lye and a blender." (Gov't Resp. at 7-8 (citing

Gov't Ex. 7-T at 7-8, 10; Gov't Ex. 8-T at 7, 10-11)). Sims also recorded a

conversation with Thomas and Crump on October 29, 2011, during which "Crump

told Sims that he was going to 'shell them damn seeds . . . get the seed out.' Sims

asked if he could help and Crump made a gesture with his hands indicating how many

seeds were at his house." (*Id.* at 8 (citing Gov't Ex. 9-T at 15)).

> On November 1, 2011, agents with the Federal Bureau of Investigation
> (FBI) executed search warrants at the residences of Crump and Adams.
> (Doc. 275 [at] 740, 747, 768, 788, 814). Agents seized a bag of castor
> beans and partially shelled castor bean shells from Crump's residence.
> (Doc. 267 [at] 936-37; Gov't Ex. 35). On December 1, 2011, agents
> executed a search warrant at a storage unit owned by Crump and seized
> the following property:
>
> > • White bag containing over 100 castor beans (Doc. 267 [at]
> > 943-46; Gov't Ex. 40)
> > • Ricin recipe and handwritten note on dimethyl sulfoxide
> > (Doc. 267 [at] 948-50; Gov't Ex. 38);
> > • Blender (Doc. 267 [at] 958-59; Gov't Ex. 39);

5

> • Several boxes containing rubber gloves (Doc. 267 [at]
> 959-61; Gov't Ex. 46-48);
> • Handwritten notes with addresses of FBI buildings in
> Georgia (Doc. 267 [at] 950-52; Gov't Ex. 41).
>
> During the trial, the government called several expert witnesses to testify
> about ricin testing on castor beans. (Doc. 267). A government expert
> testified that ricin is a biological toxin naturally occurring in the seeds of
> castor plants. ([*Id.* at] 981-82). Experts also testified that ricin is an
> extremely toxic substance capable of causing death in humans ([*id.* at]
> 998-1000, 1050, 1103), and that the castor beans recovered from both
> Adams's and Crump's properties tested positive for biologically active
> ricin. ([*Id.* at] 986, 989, 993, 995; Gov't Exs. 16, 18, 20, 26-27, 52-56).
> The government experts also testified that ingesting castor beans could
> potentially cause death in humans. (Doc. 267 [at] 999-1000).

(Gov't Resp. at 9-10).

## II.    The § 2255 Motion

In his § 2255 motion, Movant raises the following four grounds for relief:

(1) Actual Innocence; (2) Ineffective Assistance of Counsel by Trial Counsel;

(3) Ineffective Assistance of Counsel on Appeal; and (4) Deprivation of Constitutional

Rights and Court Errors.  (Doc. 300 at 4-8).

## III.    Standard of Review

A federal prisoner may file a motion to vacate his sentence "upon the ground

that the sentence was imposed in violation of the Constitution or laws of the United

States, or that the court was without jurisdiction to impose such sentence, or that the

AO 72A
(Rev.8/82)

sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). But it is well-settled that "to obtain collateral relief, a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).

## IV. Movant's Grounds For Relief

### A. Ground One: Actual Innocence

In ground one, Movant asserts that he "has maintained innocence throughout [these] proceedings and only ineffective assistance of counsel has prevented him from asserting his constitutional rights and avoid[ing] false imprisonment." (Doc. 300 at 5).

The Government argues that Movant has failed to offer new reliable evidence of his legal innocence, much less his *factual* innocence, and notes that, in any event, actual innocence is not a freestanding ground for relief, but rather only a means of lifting the procedural bar to the consideration of a substantive claim on the merits. (Gov't Resp. at 11-13 & n.2; *see id.* at 12 (noting that Movant "only states his claim of actual innocence and argues that the examples provided in his § 2255 motion 'run[] the gamut of nearly every example of ineffective assistance of counsel' " (quoting Doc. 311 (Movant's 1st Reply) ¶ 5), but he "offers no further factual proof of his

7

actual innocence beyond such blanket statements")).

In his second reply brief, Movant reasserts that

> he is actually innocent. He was never a part of the conspiracy, he never participated in the conspiracy and he was not present at specified meetings as alleged by Joe Simms [sic] to have his voice recorded. Out of 125 tapes/CDs/videos, Crump's voice is not [on] one of the recordings though the tapes/CDs were altered and someone pretending to be Crump tried to imitate his voice on some of the recordings. Specifically, throughout the tapes, words are taken out of conte[x]t to make a sentence; to make it appear Crump is in conversation with Ray Adams or Joe Simms (Child Molester) to indicate Crump's presence. Simms and Adams tried to indicate Crump's presence at meetings when he was not prese[n]t. . . . Simms carried the 125 CD tapes home then edited them trying to show defendant's involvement. He (Simms) was facing 2 life sentences for rape, molestation and 127 other crimes and worked with [the] FBI to lessen his sentence in South Carolina where the Judge set Simms free. It is only through False Testimony and jimmied tapes that Simms attempted to prove [Movant's] presence and involvement. The product was not and did not belong to Crump. Crump's finger prints and DNA were not found on the alleged evidence because Crump was not a party to the conspiracy and lacked knowledge of the conspiracy. Defendant, through Exhibits has proven his claims and herewith offers his evidence for the court[.]

(Doc. 318 (Movant's 2nd Reply) at 3-4 (formatting altered)).

If a § 2254 petitioner or § 2255 movant has procedurally defaulted a claim, "actual innocence, if proved, serves as a gateway through which a petitioner may pass," although "[t]he gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial

AO 72A
(Rev.8/82)

unless the court is also satisfied that the trial was free of nonharmless constitutional error.' " *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928, 1936 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)). "To be credible," a "claim that constitutional error has caused the conviction of an innocent person" must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. To prevail on such a claim, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327.

Movant has offered two pieces of evidence in support of his § 2255 motion. First, he has presented a notarized but unsworn two-page handwritten statement from Dan Roberts, dated June 15, 2015, in which Roberts states that Crump was never a member of Roberts's and Adams's militia group. (Doc. 318-1). But Roberts expresses no opinion as to whether or not Crump is guilty of his crimes of conviction. This unsworn statement is not evidence of Movant's actual innocence, i.e., evidence that he did not conspire to manufacture ricin. Indeed, it is not even *new* evidence. Roberts testified at trial, on cross-examination by Movant's attorney, Daniel Summer, that Movant was never a member of the militia group to which Roberts belonged.

(Doc. 277 at 105 (Trial Tr. at 1465)). Roberts also testified on re-direct-examination that several months before March 2011, i.e., *before* Sims's first meeting with Roberts's militia group, Movant told Roberts that he had been speaking with a different North Georgia militia group about making ricin, and he gave Roberts a castor bean, describing it as "extremely lethal." (*Id.* at 109-11). Roberts testified further that Movant had expressed an interest in going to Washington, D.C. to spread ricin there, after the prosecutor refreshed Roberts's memory of his May 2012 FBI interview, during which Roberts's attorney "clarified and said that [Roberts] believe[d Movant] wanted to take ricin to Washington for no other reason than to harm innocent people." (*Id.* at 112-13). Roberts added, however, that he was not aware of any actual plan to make ricin or to take it to Washington. (*Id.* at 113 ("That was just talk as far as I know.")). Summer reiterated this last point to the jury on re-cross-examination. (*Id.* at 150 ("Sammy Crump, all he did was talk big, but did nothing, correct, as far as you know?")).

Next, Movant presents an Expert Witness Report and Opinion ("Report") from an apparently unnamed "police practices expert," whose "investigation and report includes a professional assessment of the investigation conducted by [trial counsel's] law firm on behalf of Mr. Crump[, and] summarizes [his] findings and opinions

10

regarding any possible misuse of the FBI informant Joe Simms [sic] Jr. based on commonly accepted police practices for undercover work and the use of informants." (Doc. 318-3 at 2 ("It appears that the case was built entirely on tape recordings made by Joe Simms Jr. for the FBI. The FBI wired hidden cameras to record interactions between Simms and the alleged conspirators including Samuel Crump.")). The expert reviewed witness statements, "photographs/videos of the location," and "Trial Evidence including audio and video (40 hours)." (*Id.*).

> The expert states:
>
> It is my opinion that Simms was seeking to mitigate the serious criminal charges he faced for the sexual abuse of his daughters. Joe Simms Jr. wanted to curry favor with law enforcement for personal gain. Such an informant would be problematic given the incentives for him to lie. His molestation charges raise questions about any role such an informant would play in a criminal investigation. Yet it appears that the FBI's entire case is based on his testimony and his collection of the evidence on behalf of the FBI. Based on my review of the available record, the FBI dismissed credibility issues with Joe Simms Jr.

(*Id.* at 3). He notes the following issues:

> * The informant was allowed to manage evidence without direct supervision from law enforcement. This action [] runs contrary to accepted practices for law enforcement investigations.
>
> * My review of the audio and videotapes demonstrate almost no involvement by Mr. Crump in the crimes alleged. The case against Mr. Crump appears to be built entirely on the informant Joe Simms's

11

testimony about Mr. Crump's role in the crime.

\* My review of the attorney's case file demonstrates that no serious investigation was done into the background and conduct of the federal government's key witness Joe Simms Jr. by Mr. Crump's attorneys.

\* No expert witnesses were called on behalf of Mr. Crump to explain investigative steps required in the use of an undercover police informant. An audio expert was not used to authenticate or contest recordings by Joe Simms Jr. An expert witness would have been useful in explaining to the court proper investigative techniques with regard to the use of a police informant. An audio expert could have challenged the reliability of the trial evidence recordings. This information would likely have been useful to a jury. Mr. Crump's attorneys did not seek out an expert for this case.

(*Id.* at 4).

Ms. Bond [who hired the expert] reported that her father [Movant] received a deficient investigation in support of his criminal defense. My preliminary review supports this position. It does not appear that a substantive investigation was mounted by Mr. Crump's criminal defense attorney.

When we requested that Mr. Crump's attorney supply case files related to his defense of Mr. Crump we were met with resistance. Eventually, we obtained the files. The attorney's records demonstrate that minimal investigative work was performed on Mr. Crump's case. Given the gravity of the criminal charges and the potential penalties for conviction a substantial amount of additional investigative work should have been performed.

It appears that the attorney called no expert witnesses, did not fully research the key prosecution witness and failed to challenge the integrity of the recordings submitted by the police. An expert witness should have been called to explain to the court how police informants are used in a

AO 72A
(Rev.8/82)

proper investigation. The court could have been informed through expert testimony about the pitfalls of using an informant like Simms where the lion share [sic] of evidence comes from a person who is working to avoid his or her own prosecution.

(*Id.* at 5-6).

The expert summarizes his findings as follows:

This expert report is not intended to address legal matters beyond the expert's training. However it is apparent from a review of the case file that Mr. Crump's attorneys did not thoroughly investigate the federal government's key witness. A review of the investigation into the background of the federal government's key witness Joe Simms Jr. reveals that there were no records present in Mr. Crump's legal case file. A court may determine whether this was a failure sufficient to require a new trial. However it is self-evident that a thorough examination of the government's key witness is important to Mr. Crump's defense. Yet there is no evidence that an investigator interviewed witnesses who could attack Joe Simms Jr.'s character, or that anyone thoroughly collected evidence that would impeach his testimony against Mr. Crump.

The FBI investigation and use of the police informant does not appear to be consistent with accepted practices within law enforcement in my opinion. It is my opinion that the government's key witness (an unsupervised police informant with a motive) was not properly used. The lack of supervision of the informant may have impacted the evidence he provided to the government. It is also my opinion that the evidence submitted by the informant is untrustworthy because of the manner in which it was collected.

(*Id.* at 5).

This Report does not constitute *evidence* of Movant's actual, *factual* innocence.

13

It is rather — based on the expert's understanding of best police practices and his speculation about possibly tainted evidence derived from Sims's allegedly improper motives and activities — an *opinion* expressing the view that a more thorough investigation of the evidence against Movant and of Sims's background *might have* produced evidence casting doubt on the authenticity of the audio recordings made by Sims or *might have* produced evidence undermining Sims's credibility. But the report itself does not offer any such evidence.[1] Ground one fails as a standalone claim, as

---

[1]In fact, Scott Matthewson, the Joint Terrorism Task Force agent who was Sims's "handler," testified that "the [digital] recording devices" that Sims wore to record his meetings with Movant and others "could only be accessed by the squad that [set up the software for the recordings]. I could not access those recorders. . . . I would take it down to that squad. They would download it to the computer and they would burn it to a CD and give it to me" for review. (Doc. 271 at 123-24 (Trial Tr. at 218-219); *id.* at 34-36 (Trial Tr. at 129-31) (discussing the recorder in general terms and Sims's first recording, of the March 17, 2011 meeting)). Sims testified that on several occasions Matthewson would turn on the device before giving it to Sims and turn it off after retrieving the device from Sims later. (*See* Doc. 272 at 48-49 (Trial Tr. at 321-22) (discussing the July 2, 2011 recording); *id.* at 66-67 (Trial Tr. at 339-40) (discussing the August 1, 2011 recording); Doc. 273 at 32-33 (Trial. Tr. at 400-01) (discussing the October 15, 2011 recording)). Agent Matthewson also testified that federal officials made it clear to Sims throughout his time as an informant that they "would not help him in any way, shape or form with his [South Carolina criminal] case, that it had to go through the court like a regular investigation." (Doc. 271 at 62 (Trial Tr. at 157); *see also* Doc. 275 at 17 (Trial Tr. at 726) (testimony of FBI Agent Dixon: "First of all, regarding this specific situation with Mr. Sims, we did tell him from the onset that we would not interfere with his [child molestation and related] charges, only that we would advise the prosecutor's office for where he was facing charges of his involvement, his cooperation with us. Secondly, the nature of his charges is not something that we would typically get ourselves involved with and influence in any way.")). Sims often complained to Matthewson and other federal agents, to no avail, that he was not getting enough in return for his role in the investigation,

a matter of law (*see* Gov't Resp. at 11 n.2), and also as a basis for overcoming any procedurally barred claim that Movant has raised elsewhere in his § 2255 motion.

### B.   Ground Two:  Ineffective Assistance Of Trial Counsel

In ground two, Movant claims ineffective assistance of trial counsel, offering the following examples:

> No representation during plea; not fully informed of the nature or cause of the charges against me; failure of Counsel to seek Plea, discuss positives and negatives of taking a plea, to consult regarding evidence against me, to challenge or invoke any meaningful adversarial testing at all, suppress improperly collected alleged evidence, force Government to turn over exculpatory evidence, conduct any reasonable investigation into the facts, to secure my right to a Speedy Trial, to protect my liberty interests and act as a champion of my rights, discredit agent-informant's collection of evidence and testimony, question or challenge jury selection, look into the authenticity of recordings, be present for search of my storage unit; creating a Cronic Violation and failing to excuse himself for poor health; admission he did believe[] he should have performed better; failure to obtain fingerprint, DNA or financial/purchase evidence to exonerate me; and numerous other issues that led to a complete denial and suppression of my rights.

(Doc. 300 at 4).

The Government characterizes these claims as alleging that counsel was ineffective for failing to do the following:

---

specifically, help in resolving the South Carolina charges.  (*See, e.g.,* Doc. 273 at 108-09, 115-17 (Trial Tr. at 476-77, 483-85)).

15

1.   represent Crump during [a] plea;
2.   duly inform Crump of the nature or cause of the charges against him;
3.   seek [a] plea;
4.   discuss [the] positives and negatives of taking a plea;
5.   consult regarding [the] evidence against Crump;
6.   challenge or invoke adversarial testing;
7.   suppress improperly collected evidence;
8.   force [the] Government to turn over exculpatory evidence;
9.   conduct a reasonable investigation into the facts;
10.  secure Crump's right to a speedy trial;
11.  protect Crump's liberty interests and act as a champion of his rights;
12.  discredit [the] agent-informant's collection of evidence and testimony;
13.  question or challenge jury selection;
14.  look into the authenticity of recordings;
15.  be present for the search of Crump's storage unit;
16.  excuse himself for poor health; and
18.  obtain fingerprint, DNA, or financial/purchase evidence to exonerate Crump.

(Gov't Resp. at 13-15 (adding that Movant claims that his trial counsel was ineffective "for admitting that he believed he should have performed better" (claim 17) and "due to numerous other issues that led to a complete denial and suppression of [his] rights" (claim 19))).

The Supreme Court set forth the standard for evaluating claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984), *see Dell v. United States*, 710 F.3d 1267, 1272 (11th Cir. 2013) (applying *Strickland* standard of review to ineffective-assistance-of-counsel claim raised in § 2255 motion). "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding

16

whose result is challenged." *Strickland*, 466 U.S. at 697. The analysis involves two components, but a court need not address both if the petitioner "makes an insufficient showing on one." *Id.*

First, a federal court determines "whether, in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. The court "must be highly deferential" in scrutinizing counsel's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (Internal quotations omitted). "Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*). Second, a federal court determines whether counsel's challenged acts or omissions prejudiced the petitioner, i.e., whether "there is a reasonable probability"—one "sufficient to undermine confidence in the outcome"—that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

17

The Government argues that in claims 1, 2, 4, 5, 10, 11, 16 and 19, Movant "has essentially produced a list of tasks that a trial counsel might perform in the context of providing legal services to a defendant; but he has not provided facts demonstrating actual failure to complete those tasks, and he has not linked any facts to a demonstration of deficient performance or to [a] demonstration of actual prejudice." (Gov't Resp. at 18).[2] With respect to claims 3, 6-9, 12-15, 17 and 18, the Government

---

[2]     The Government notes with respect to claim 1 — alleging that trial counsel failed to represent Movant "during [a] plea" — that there was no plea. (Gov't Resp. at 18-19). Regarding claim 2 — alleging that trial counsel failed to inform Movant of the "nature or cause of the charges" against him — the Government argues that the claim fails because Movant "was made aware of the indictment against him, and the indictment did notify him of the elements of the crime and the factual bases therefore." (*Id.* at 19-20 (noting that Movant "does not allege any flaws with the indictment, just with his trial counsel")). Regarding claims 4 and 5 — alleging that trial counsel failed to "discuss [the] positives and negatives of taking a plea" and "consult regarding [the] evidence against" him — the Government argues that it "cannot know whether Crump is claiming his trial counsel never discussed [the] positives and negatives of taking a plea or failed to do so in an objectively competent manner," and it "cannot know whether Crump is claiming his trial counsel *never* discussed the evidence against him or did not do so in an objectively competent manner. Without factual allegations, Crump's claims here are baseless and frivolous." (*Id.* at 20-21). The Government makes similar arguments regarding claim 10 (alleging trial counsel's failure to secure Movant's right to a speedy trial) and claim 11 (alleging trial counsel's failure to protect his rights generally and to champion his cause) — noting that "trial counsel engaged in direct and cross-examination, objected to opposing counsel or court actions when in the best interest of his client, and aided his client by writing and filing motions on his behalf." (*Id.* at 21-22 (citing Doc. 74; Doc. 76; Doc. 149; Doc. 167; Doc. 208; Doc. 209; Doc. 247; Doc. 270 at 1; Doc. 271 at 96; Doc. 272 at 274; Doc. 273 at 369; Doc. 274 at 546, 665; Doc. 275 at 710, 800; Doc. 267 at 924, 1032; Doc. 268 at 1278, 1282; Doc. 277 at 1462; Doc. 278 at 1643)). The government makes a similar argument for claim 16 (alleging trial counsel's failure to excuse himself for his alleged failing health) and claim 19 (alleging, without

argues that these "claims fail to include any facts demonstrating that no competent counsel would have taken the action that his counsel did take." (*Id.* at 24-25 (internal quotations omitted)).[3]

---

specifying, "numerous other issues") — noting that Movant "has alleged no facts, has not alleged any specific behavior committed by his trial counsel, and therefore resoundingly fails to meet either of the *Strickland* requirements." (*Id.* at 22-23).

[3]The Government argues with respect to claim 6 — alleging that trial counsel failed to "challenge or invoke any meaningful adversarial testing at all" — that even if Movant "is referring to his desire for his counsel to have conducted independent testing of the evidence to bring out any differences with the testing conducted by [the] government, . . . . [it was] reasonable for [his] trial counsel to have strategically decided that additional testing, beyond the defense expert's analysis of [the] government's testing, would not have been worth the outcome for his client." (Gov't Resp. at 26-27 (referring to the defense expert that Movant's co-defendant hired and examined at trial)). The Government argues that there are "a litany of logical strategic reasons why Crump's trial counsel might not have raised the evidentiary concerns Crump lists" in claim 7 (failing to "suppress improperly collected evidence"), claim 8 (failing to "force the Government to turn over exculpatory evidence") and claim 12 (failing to "discredit the agent-informant's collection of evidence and testimony"), "and therefore . . . Crump fails to meet his burden of proving incompetent performance." (*Id.* at 27-28). The Government makes a similar argument with respect to claim 9 (alleging trial counsel's failure to "conduct a reasonable investigation into the facts"), claim 13 (alleging trial counsel's failure to "question or challenge jury selection"), claim 14 (alleging trial counsel's failure to "look into the authenticity of recordings"), claim 15 (alleging trial counsel's failure to "be present for the search of Crump's storage unit") and claim 18 (alleging trial counsel's failure to "obtain fingerprint, DNA, or financial/purchase evidence to exonerate Crump") — arguing that "[t]hese are yet additional examples of possibly strategic decisions made by trial counsel," regarding which Movant "fails to both allege adequate facts and to demonstrate that his trial counsel's alleged failures either were incompetent or resulted in prejudice." (*Id.* at 28-29 (noting with respect to claims 13 and 18: "Perhaps trial counsel decided that the jury selection was adequate and would be capable of fulfilling its duty honestly. Further, perhaps there were no fingerprints, DNA, or financial/purchase evidence that would have exonerated Crump, or perhaps his trial counsel did discover such evidence but determined that releasing it would further incriminate him or would otherwise obscure the important issues in the case.

19

Movant replies as follows:

[This case] was originated by Joe Simms [sic] (possibly for a Rule 35 Motion) so he could avoid a two life imprisonment sentence for 129 counts of Sexual related and other crimes. This event alone should have set-off an alarm in the defense attorney. Information and testimony in court proved that Crump was an innocen[t] bystander and neophyte tractor-trailer driver and had nothing to do with any attempts to make bombs or take a form of action to overthrow the government (See Exhibit A, 2 pages[] by Emory Dan Robert[s]). Defense Attorney [did not] launch[] an investigation into the activities of Informant Joe Simms and his client Samuel Crump to confirm and prove or disprove their statements. Defense counsel did not get character statements and he did not confirm Defendant's employment and road trips with his employer. He did not have expert witnesses analyze the 125 CDs tape recordings done by Joe Simms to verify if Crump's voice was actually on the recordings and he did not adequately interview or question at trial, government witnesses for v[e]racity. Crump, by his testimony, could have proven his whereabouts and non-involvement in the conspiracy.

At trial, Defense Attorney did not ask proper questions and when government witnesses didn't want to answer questions, the testifying witness was shown to[o] much consideration for the quantity of untruths he told. And Joe Simms committed perjury but my defense attorney lacked skills to impeach him or the other lying witnesses. This . . . ineffectiveness created a prejudiced trial and unlawful term of imprisonment due to a lack of due process, ineffective assistance of counsel and fraud on the court.

(Movant's 2nd Reply at 2-3).

Most of Movant's allegations appear to be the product of his own imagination.

Even if Crump was able to fulfill his showing of incompetency, Crump fails to demonstrate how either choice resulted in prejudice.")).

There is no evidence that the recordings that Sims made of meetings with Movant and others were altered in any way. Indeed, based on the testimony of Agent Matthewson, it is hard to imagine how Sims himself could have altered them. And although Sims's recordings and testimony provided much of the evidence against Movant, Roberts's testimony was also damaging, as was the discovery of castor beans in Movant's storage unit. The jury was entitled to believe — based on the uncontroverted, and largely incontrovertible, evidence — that Movant was guilty of the crimes charged against him. Aside from the assertions set forth in Movant's and his expert's unsupported speculations, expert testimony most likely would not have altered the jury's perception of the evidence against Movant. He was not charged with manufacturing ricin, but rather with *conspiring* to manufacture ricin and with possessing castor beans to do so. His possession of the latter is not in dispute, and Summer's presence at the search of his storage unit would not have changed that fact.

Given the evidence against Movant, he has not shown that Summer adopted an unreasonable defense strategy or that he was prejudiced by Summer's strategic choices. Summer's strategy was to paint Movant as a big talker who had no intention of putting that talk into action. (*See* Doc. 278 at 79-83 (Trial Tr. at 1688-92) (Summer's closing argument, identifying Sims as the moving force behind the alleged

conspiracy, based on his powerful motive to escape punishment on his child molestation charges, and contrasting Sims with Movant, whom Summer characterized as someone merely blowing off steam at the Government, as older men gathered at the Waffle House are prone to do, but who otherwise was a likeable, honest, law-abiding, non-violent gentleman who "talks a lot, but at the end of the day, no action"); *see id.* at 79 ("What's significant is that [ricin] recipe sat in [Movant's] storage locker for over a year and a half. And guess what? It would have sat there in that storage locker until the day Sammy Crump died but for one thing, Joe Simms [sic]. Who was driving this train? Joe Simms. Like they said, but for Joe Simms, we'd all be doing different things this week. Okay. Who had the real motive to get out of trouble? Joe Simms. Who had the most to gain for making this case? Joe Simms. Joe Simms found himself in a very bad predicament. Here's a guy accused of having sex with his own children, got convicted of child pornography."); *id.* at 81 ("Literally, and I mean this sincerely, this case is nothing but a hill of beans. Here's the beans, and that's it, nothing more. They want to bring in all these beans, they want to bring in the recipe. That's fine, but the case was never made, no ricin, no intent to make it, a bunch of guys talking stuff at the Waffle House.")).

And Summer used his opportunity to cross examine the Government's witnesses

to good advantage. Sims acknowledged on Summer's cross-examination that Movant was "always laughing, joking," talking about "bikes and women," whereas it was Sims who kept bringing up the subject of ricin. (Doc. 274 at 126-27, 134 (Trial Tr. at 671-72, 679)). Sims also acknowledged that he only heard Movant say that he would *like to* make ricin, not that he was *going to* make ricin; he never saw any ricin; and he never saw Movant making ricin. (*Id.* at 127-28, 134).

Agent Dixon acknowledged on Summer's cross-examination that Movant was not on the FBI's radar until Sims put him there. (Doc. 275 at 28 (Trial Tr. at 737)). Summer questioned Dixon closely about Sims's criminal charges, suggesting that they affected Sims's credibility, although Dixon did testify that "the information that [Sims] provided to us, the majority of all of it was corroborated." (*Id.* at 29-30 (Trial Tr. at 738-39)). Agent Pinette acknowledged that he had never heard Movant's name before the Sims investigation began and that he did not find any ricin in Movant's possession. (*Id.* at 57 (Trial Tr. at 766)). Agent Julien acknowledged that unprocessed castor beans will usually test positive for ricin. (*Id.* at 77 (Trial Tr. at 786)). Agent Ray acknowledged that looking up a recipe for ricin and possessing it, as well as possessing castor beans, is not illegal. (*Id.* at 91-92 (Trial Tr. at 800-01) ("So legal plus legal equals legal; correct?")). Agent Keys acknowledged on

23

Summer's cross-examination that, as far as he knew, no ricin was found, only castor beans, which are perfectly legal. (Doc. 267 at 17 (Trial Tr. at 940)). Agent Mossman acknowledged that Movant's storage unit was "full of personal and household effects," all "perfectly legal." (*Id.* at 44-45 (Trial Tr. at 967-68)).

Dr. Bull acknowledged on Summer's cross-examination that, other than the castor beans, nothing in Movant's possession tested positive for ricin and that "nothing [he had] seen in this case was used to manufacture ricin." (*Id.* at 112-13 (Trial Tr. at 1035-36)). Dr. Harris acknowledged that an extract prepared from a castor bean for testing will typically test positive for ricin. (*Id.* at 176-77 (Trial Tr. at 1099-1100)). And finally, Agent Werking acknowledged that there was no evidence that Movant had crushed castor beans in a blender or otherwise, or that he had any acetone or lye for making ricin. (Doc. 268 at 131-32 (Trial Tr. at 1278-79)). And Werking acknowledged that the recipe for making ricin found in Movant's storage locker had been printed in February 2010, more than a year and a half before Movant's and Adams's arrest. (*Id.* at 132-33).

Summer also presented favorable character evidence from three of Movant's longtime friends. (Doc. 278 at 26-37 (Trial Tr. at 1635-46)). Each of these witnesses vouched for Movant's good reputation for being peaceful, honest and law-abiding,

24

variously describing him as a "very laid back" guy, who "liked to laugh and talk and tell jokes and have fun," as a "happy go lucky" guy, who was "awesome" and "just a barrel of fun," and as someone who had often led fund raisers on his motorcycle to raise money for cancer and autism. (*Id.*). None of the witnesses had ever seen him act violently or express hatred toward anyone. (*Id.*).

In short, Summer gave the jury every opportunity to acquit his client, but the jury was entitled to believe the evidence against Movant presented by the Government, and it did. Movant has not pointed to any credible basis for disbelieving the Government's evidence or to any specific action that Summer took or failed to take that prejudiced the outcome of Movant's trial to such an extent that it constituted ineffective assistance of counsel. Movant's ground two claims of ineffective assistance of trial counsel therefore fail.

### C.  Ground Three:  Ineffective Assistance Of Appellate Counsel

In ground three, Movant claims that his appellate counsel provided ineffective assistance when he "failed to consult with me on my case, trial and sentencing proceedings and altogether failed to represent my interests in any meaningful manner; I was not even aware of what Appeal Counsel intended to appeal until the day I received the denial of my Appeal from the Court on the single issue raised."  (Doc.

25

300 at 7).

The government argues that Movant's claims of ineffective assistance of appellate counsel are also vague, with no specific facts to support them. (Gov't Resp. at 30-32). Movant replies:

> Appellate Counsel [] was not allowed to investigate anything outside of what was presented to him. Appellate Counsel's <u>limitations</u> in light of the evidence should have initiated an intense inquiry into the circumstances of the creation of the case since everything was initiated by a child molester facing 129 counts and two (2) Life IMPRISONMENT SENTENCES.

(Movant's 2nd Reply at 2).

"A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). "A defendant can establish ineffective assistance of appellate counsel by showing: (1) appellate counsel's performance was deficient, and (2) but for counsel's deficient performance he would have prevailed on appeal." *Shere v. Sec'y, Fla. Dep't of Corr.*, 537 F.3d 1304, 1310 (11th Cir. 2008) (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)). However, appellate counsel "need not advance *every* argument, regardless of merit, urged by the appellant." *Lucey*, 469 U.S. at 394; *see Robbins*, 528 U.S. at 288 (noting that "it is difficult to demonstrate that

26

[appellate] counsel was incompetent" for failing "to raise a particular claim," and "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome" (internal quotations omitted)); *Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir. 1991) (stating that neglected claim satisfies test for ineffective assistance only if claim would have had "a reasonable probability of success on appeal").

Here, Movant is even less specific about what appellate counsel could have done differently to prevail on appeal than he is regarding his trial counsel's alleged deficiencies. In short, he has shown neither deficient performance by appellate counsel nor prejudice arising from appellate counsel's performance. His ground three claims of ineffective assistance of appellate counsel also fail.

### D.    Ground Four: Deprivation Of Constitutional Rights & Court Error

In ground four, Movant alleges the following "Deprivation of Constitutional Rights and Court Errors":

> First Amendment - freedom of speech, freedom of association; Fourth Amendment - improper Search and Seizure, false evidence, illegal detention of and excessive [force] against my sister and niece, indictment issues on false testimony; entrapment, and others. Fifth Amendment - Indictment based on false testimony, denial of Due Process, denial of civil liberties, Court-imposed Counsel against my wishes, and others; Sixth Amendment - denial of Speedy Trial, not told the nature and cause

27

of charges against me or consulted on the pros and cons of choices; Eighth Amendment - Cruel and Unusual treatment of an innocent, now 73 year old man, father, active member of the community, etc. over a crime that never existed, being a fantasy created by the FBI and their agent-informant.

(Doc. 300 at 8).

The Government responds that Movant's claims of constitutional and trial court error are procedurally barred because he could have raised these claims at trial and/or on direct appeal, but he has established neither cause and prejudice nor his actual innocence to lift the procedural bar. The Government also argues that none of the claims has merit. (Gov't Resp. at 32-36; *see id.* at 36 ("Regarding Crump's allegations of violations of his Fourth, Fifth, Sixth, and Eighth Amendment rights: Crump simply lists the components of each Amendment without providing any facts whatsoever that would demonstrate a violation of any of his rights, rendering his complaints frivolous and unproven. Crump has provided no specific information or evidence to demonstrate that his alleged denial of his First, Fourth, Fifth, Sixth, or Eighth Amendment rights resulted in an adverse ruling or actual injury. Therefore, Crump fails to establish a single one of his claims of deprivation of constitutional rights or district court errors under Ground four.")).

The Court agrees. Movant has not provided any support for any of his ground

four claims, which are both procedurally barred and without merit.

### E. <u>Evidentiary Hearing</u>

Movant asks for an evidentiary hearing. (*See* Movant's 1st Reply at 10-11).

But he is not entitled to one.

> A prisoner is entitled to an evidentiary hearing on a motion to vacate "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see Anderson v. United States*, 948 F.2d 704, 706 (11th Cir. 1991). Thus, if a movant "alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim." *Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002) (quotation marks omitted). [But] the district court is not required to hold a hearing . . . "if the allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) (quotation marks omitted).

*Chun Hei Lam v. United States*, 16-11766, 2017 U.S. App. LEXIS 22756, at *3 (11th Cir. Nov. 14, 2017).

The Government argues that a hearing is not required here because Movant has failed to "allege reasonably specific, non-conclusory facts that, if true, would entitle him to relief." (Gov't Resp. at 36 (internal quotations omitted); *see id.* at 37 ("the district court does not need to grant an evidentiary hearing if the petitioner's allegations are patently frivolous, based upon unsupported generalizations, or

29

affirmatively contradicted by the record" (internal quotations omitted))). The Court agrees. Movant's "allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record." *See Chun Hei Lam*, 2017 U.S. App. LEXIS 22756 at *3. After a thorough review of the trial record, the Court finds no basis for an evidentiary hearing in this matter.

## V.     Certificate of Appealability

A § 2255 movant must obtain a certificate of appealability ("COA") before appealing the denial of a motion to vacate. 28 U.S.C. § 2255(d); 28 U.S.C. § 2253(c)(1)(B). A COA may issue only when the movant makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the [motion to vacate] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations omitted). A movant need not "show he will ultimately succeed on appeal" because "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir.) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 337, 342 (2003)). Although *Slack* involved an appeal from

the denial of a 28 U.S.C. § 2254 petition, the same standard applies here.  *See Jones v. United States*, 224 F.3d 1251, 1254 (11th Cir. 2000) (applying *Slack* standard in § 2255 case).  Because there is no reasonable argument that any of Movant's grounds has merit, a COA should not issue in this matter.

## VI.   **Miscellaneous Motions**

Movant has filed a combined motion for summary judgment, due to the government's alleged failure to file a timely response to his § 2255 motion; motion for a COA; and motion for appointment of counsel.  (Doc. 308).  These motions should be denied.  Just as for default judgment, summary judgment is not an appropriate remedy in a § 2255 case, especially when, as here, the government filed a timely response once Movant filed a signed copy of his § 2255 motion.  (*See* Docs. 300, 303, 307, 310, 315, 317); *see also Anyanwu v. United States*, 1:12-CR-190-TWT-JSA, 2016 U.S. Dist. LEXIS 100315, at *7 (N.D. Ga. May 24) (denying motion for default judgment in § 2255 action because "it is well settled that default judgment is not contemplated in habeas proceedings" (citing *Aziz v. Leferve*, 830 F.2d 184, 187 (11th Cir. 1987)), and noting that the government filed a timely response), *adopted by* 2016 U.S. Dist. LEXIS 99976 (N.D. Ga. July 28, 2016).  A COA is not warranted here, as shown above.  And because an evidentiary hearing is not required for the resolution

31

of Movant's claims, he is not entitled to appointment of counsel. *See Lee v. United States*, CV 116-139, 2016 U.S. Dist. LEXIS 147908, at *10-11 (S.D. Ga. Sept. 27, 2016) ("In sum, except in rare and extraordinary cases where due process principles of fundamental fairness would be violated if counsel is not appointed, there is no federal constitutional right to appointed counsel." (formatting altered) (internal quotations omitted) (quoting *McCall v. Cook*, 495 Fed. Appx. 29, 31 (11th Cir. 2012), to the effect that "appointment of counsel is 'a privilege that is justified only by exceptional circumstances' ")), *adopted by* 2016 U.S. Dist. LEXIS 147519 (S.D. Ga. Oct. 25, 2016).

Movant has also filed a Federal Rule of Civil Procedure 60(b)(4) motion for relief from his convictions and sentences (Doc. 312), but such a motion, filed under a rule of *civil* procedure, is not appropriate in a *criminal* proceeding. *See, e.g., United States v. Pope*, 124 Fed. Appx. 680, 682 (2d Cir. 2005) (FED. R. CIV. P. 60(b)(4) motion "is not an appropriate vehicle for defendant's attempt to vacate his criminal conviction because the Federal Rules of Civil Procedure govern 'suits of a civil nature.' Fed. R. Civ. P. 1. While a Rule 60(b) motion may be used to set aside a habeas denial in limited circumstances, it does not itself seek habeas relief. Here, defendant was not seeking to set aside a denial of habeas relief, since he never sought

32

such relief in the form of a motion under 28 U.S.C. § 2255." (citation and internal quotations omitted)); *see also United States v. Blanco*, 632 Fed. Appx. 549, 551 (11th Cir. 2015) (FED. R. CIV. P. 60(b) "does not provide for relief from a judgment in a criminal case"); *Smith v. United States*, 433 Fed. Appx. 891, 893 (11th Cir. 2011) ("The district court did not err in denying Smith relief under FED. R. CIV. P. 60(b)(4) because that rule of civil procedure could not be used to attack Smith's criminal judgment . . . .").[4]

## VII.  Conclusion

**IT IS RECOMMENDED** that Movant's 28 U.S.C. § 2255 motion (Docs. 300, 307) and his other motions (Docs. 308, 312) be **DENIED** and that Movant be **DENIED** a certificate of appealability.

The Clerk is **DIRECTED** to withdraw the reference to the Magistrate Judge.

**SO RECOMMENDED** this 30th day of November, 2017.

 /s/ *J. CLAY FULLER*     
J. CLAY FULLER
United States Magistrate Judge

_____

[4]The Court notes that the motion raises issues that are patently frivolous and do not appear to relate to the proceedings in Movant's criminal case, except as they might relate to all criminal proceedings brought in the federal courts.  (*See generally* Doc. 312).

33